UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SEDGWICK C. BEARD, | ) | |
| | ) | |
| Plaintiff, | ) | 09 C 4218 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| DON McCUE CHEVROLET, INC., a Wisconsin | ) | |
| corporation, TIMOTHY McCUE, individually, and | ) | |
| MARK NEUMANN, individually, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Sedgwick Beard, a former salesperson at the Don McCue Chevrolet car dealership,

brought this suit against the dealership and two of its managers, Timothy McCue and Mark

Neumann. Beard, an African-American with injuries that make walking difficult and painful,

alleges that Defendants discriminated against him on the basis of his race in violation of 42

U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and on

the basis of his disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101

*et seq*. ("ADA"); subjected him to a hostile work environment in violation of Title VII and

§ 1981; and failed to make reasonable accommodations for his disability in violation of the

ADA. Defendants have moved for summary judgment on all claims. The motion is granted.

In brief, Beard's claims fail for the following reasons. He has not presented evidence

that he was actually terminated, or suffered some other materially adverse employment action, as

required for his race and disability discrimination claims. He has failed to point to evidence of

either severe or pervasive harassment on the basis of his race, as required to prevail on his

hostile work environment claim. And with respect to his ADA failure to accommodate claim, Beard failed to exhaust his administrative remedies by bringing that claim to the EEOC prior to filing suit.

## Background

The facts are stated as favorably to Beard as the record and Local Rule 56.1 allow. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment, the court must assume the truth of those facts but does not vouch for them. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012).

Beard was employed as a sales consultant at Don McCue Chevrolet ("McCue Chevrolet"), a car dealership in St. Charles, Illinois, from 1990 through July 16, 2008. Doc. 86 at ¶¶ 1-2. Timothy McCue ("McCue") is the general manager and president of McCue Chevrolet; he took over from his father, Don McCue, in 1996. *Id*. at ¶ 3; Doc. 92 at ¶ 2. Mark Neumann was hired to serve as the dealership's general sales manager on January 7, 2008. Doc. 86 at ¶ 4. Both McCue and Neumann had supervisory authority over Beard. *Id*. at ¶ 5.

Beard was successful as a car salesperson. Doc. 92 at ¶ 13. McCue acknowledged that Beard was "a good salesperson" and had consistently been in the top third of salespersons at the dealership; Neumann agreed that Beard was "a good salesperson" and called him "a hard worker"; and a coworker of Beard's, a man named Howland, said that plaques at the dealership showed that "almost consistently every month [Beard] was salesman of the month." Doc. 86-19 at 15; Doc. 86-16 at 5-7; Doc. 86-10 at 38.

But Beard felt that Defendants treated him less favorably than employees who were not African-American or disabled. Beard was not promoted to manager despite his high sales; he admits that he did not seek a promotion, but as he understood the practice at McCue Chevrolet,

successful salespersons were promoted without having to apply.  Doc. 86 at ¶ 53; Doc. 92 at

¶ 14.  Salespersons were issued "demo" (demonstration) cars to drive; Beard claims he was

consistently given demo cars that were not as nice as those issued to his coworkers, and shortly

after Neumann started, Beard's new demo was taken from him and exchanged for a used one,

with no reduction in the charge Beard was required to pay.  Doc. 92 at ¶¶ 23-24; Doc. 86 at ¶ 10.

In addition, Beard was required to "split" commissions with other salespersons under

circumstances in which non-African-American salespersons were not required to split.

Specifically, when Beard was dealing with one customer and had others waiting for him and

willing to keep waiting until he was free, the manager would have other salespersons help the

waiting customers and collect part of the commission; yet non-African-American salespersons in

the same situation were permitted to keep their customers waiting until they were available, and

thus were able to keep the whole commission on sales made to those customers.  *Id*. at ¶ 28.

Unlike his coworkers, Beard was not given a password to a General Motors website that allowed

salespersons to "build" vehicles for customers.  *Id*. at ¶ 17; Doc. 86-9 at ¶ 3.  And the dealership

did not pay for Beard's postage on mailings sent to current or prospective clients, though it did

so for other salespersons.  Doc. 92 at ¶ 16; Doc. 86-9 at ¶ 4; Doc. 86-15 at 45.

Throughout his time at McCue Chevrolet, Beard walked with a limp, the product of a

childhood knee injury.  Doc. 92 at ¶ 12.  In 2002 or 2003, he began experiencing hip pain as

well, and the combined pain in his knee and hip made walking difficult.  *Ibid*.  In 2003, Beard's

doctor prescribed him pain medications and told him to limit his walking to minimize the pain.

*Id*. at ¶ 19.  Beard sought several accommodations from McCue Chevrolet to help him remain an

effective employee while limiting the amount of walking he had to do: he asked to be allowed to

use a golf cart to get around the car lot; he tried paying the dealership's porters with his own

money to pull vehicles up to the dealership office's door for customers to test drive so that he would not have to walk out to the lot himself; he often parked in spaces reserved for customers, which were nearer to the office than the employees' spaces; and he prevailed upon Neumann's predecessor, a man named Pisano, to allow him to move his desk near the office's front door so he could more easily reach customers when they walked in. *Id.* at ¶¶ 21-22, 34-38. But McCue rejected the golf cart request, and he disapproved of Beard's use of the porters, telling one of them that he did not have to pull up cars for Beard, which led that porter to refuse to do so when McCue was at the dealership. *Id.* at ¶¶ 21, 35-36. And Beard sometimes was told to move his car from the customer parking spots, and when Neumann took over from Pisano, he and McCue moved Beard's desk so that it was third or fourth from the door, about 25 feet away, rather than closest to the door. *Id.* at ¶¶ 22, 37.

Neumann in particular was antagonistic towards Beard. One of their interactions had clear racial implications: Beard was at his desk dealing with customers when he received a call from Neumann, who asked why Beard was taking so long and whether he was ordering "watermelons and bananas." *Id.* at ¶ 31; Doc. 78-2 at 17-18. Beard left a message with McCue asking to discuss the incident, but McCue never responded. Doc. 92 at ¶ 31. In another racially charged incident, an unidentified person removed a photo of Beard's son, who is Caucasian, from Beard's desk and replaced it with a picture of African-American children; Beard does not know who made the switch, but his gut feeling is that Neumann either perpetrated or condoned it. Doc. 86-3 at 18; Doc. 92 at ¶ 26. Another African-American employee, named Jones, testified at his deposition that he perceived Neumann as treating employees differently and playing favorites based on race, though Jones did not give specific examples and also mentioned that Neumann was generally unpleasant to employees of all races. Doc. 92 at ¶ 30.

Neumann also mistreated Beard in ways that were not explicitly racial. He referred customers to other salespersons more often than to Beard, who believed that the different treatment was based on his race. Doc. 86 at ¶¶ 13-14; Doc. 86-3 at 30-32. Neumann also required Beard to come to his desk for meetings that could instead have been conducted by phone, despite Beard's difficulty walking. Doc. 92 at ¶ 27. Neumann berated Beard in front of customers in a way that Beard considered unprofessional; Beard never saw him treat other salespersons the same way. *Id*. at ¶ 29. And on the day before his alleged termination, Beard was passing Neumann in the hall when Neumann bumped him aggressively on his bad hip—Beard says it was like a hockey hip check—almost causing him to fall. Doc. 86-6 at 17; Doc. 98 at ¶ 44. Neumann did this despite knowing of Beard's injury. Doc. 98 at ¶ 44.

On July 15, 2008, Beard left work two hours before the scheduled end of his shift, having received permission from the desk manager to do so and having begun the workday two hours early to make up the time. *Id*. at ¶¶ 45-46. Shortly thereafter, Neumann called Beard to tell him that he was fired and needed to clean out his desk; when Beard asked why, Neumann replied, "you left early." *Id*. at ¶ 47. Beard tried to explain that he had received permission to leave early, but Neumann did not accept the explanation. Doc. 86 at ¶¶ 5960; Doc. 98 at ¶ 47. Beard arrived the next day and, believing he had been terminated, prepared to clean out his desk. Doc. 98 at ¶ 48. That afternoon, at a meeting between Neumann and Beard, Neumann told Beard to consider whether he wanted to keep working at McCue Chevrolet and said that if he did, he should come back for his next scheduled shift the following Monday; Neumann did not repeat his statement of the previous day that Beard was being fired. Doc. 86 at ¶¶ 62, 64-65. In fact, as Beard recalled the meeting: "He [Neumann] had said to me that—and he made the statement, and I recall it vividly, that—and this was directly from Tim [McCue]'s desk that this—I was not

being terminated." Doc. 86-8 at 10. After the meeting, Neumann told Beard to hand over the keys to his demo car. Doc. 98 at ¶ 51. Apparently based on his understanding that the dealership revoked employees' demo keys only when they were being terminated, had been ticketed for driving under the influence, or had their driver's licenses revoked—and despite Neumann's statement that Beard was not being terminated and that Beard should decide whether he wanted to keep working for the dealership and should come back on Monday if he did—Beard concluded that he had been terminated and never returned to work. Doc. 98 at 51-52; Doc. 86 at ¶ 68.

About a month later, Beard filed a charge of discrimination against McCue Chevrolet with the EEOC, complaining of discrimination, harassment, and retaliation on the basis of his race and discrimination on the basis of his disability. Doc. 1 at 13. The EEOC responded with a right-to-sue letter, *id*. at 14, and Beard brought this lawsuit.

## Discussion

### I.     Statute of Limitations

Defendants contend that some of the alleged events set forth above occurred outside the applicable statutes of limitations, which are 300 days before Beard filed his EEOC charge for the Title VII and ADA claims and four years before he filed this lawsuit for the § 1981 claims. *See Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, 239 (7th Cir. 2004) (Title VII and ADA); *Dandy v. UPS, Inc.*, 388 F.3d 263, 269 (7th Cir. 2004) (§ 1981). Although some of the alleged misconduct is not independently actionable, none is irrelevant, for time-barred prior acts can serve as "background evidence in support of a timely claim" of a discrete violation, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), and can help to establish a "continuing

violation" in the form of a hostile work environment, *id*. at 116-17. At any rate, because all of Beard's claims fail for other reasons, the limitations issue is beside the point.

## II. Race and Disability Discrimination Claims

### A. Title VII and § 1981

Beard alleges that Defendants discriminated against him based on his race in violation of Title VII and § 1981. Although the two statutes differ in scope and in their procedural and remedial provisions, they require the same analysis on the merits, *see Smith*, 681 F.3d at 895-96 & n.2, so they will be treated as one. Under both statutes, a plaintiff may seek to forestall summary judgment under the direct and indirect methods of proof. *See Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012); *Rodgers v. White*, 657 F.3d 511, 516-17 (7th Cir. 2011). Beard invokes both. Under either method, Beard must show that he suffered a "materially adverse employment action." *See Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1068-69 & n.9 (7th Cir. 2012); *de la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 685 (7th Cir. 2008). Because that requirement proves fatal to Beard's race discrimination claims, there is no need to discuss the other elements of the direct and indirect methods.

Beard argues that four alleged acts constitute materially adverse employment actions: (1) the moving of his desk from the position nearest the door to further away; (2) the replacement of his new demo car with a used car; (3) the failure to promote him to manager although he was an excellent salesperson; and (4) his alleged termination in July 2008. "A materially adverse employment action is something more disruptive than a mere inconvenience or an alteration of job responsibilities. While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder

employee did not like would form the basis of a discrimination suit." *Nichols v. S. Ill. Univ.–Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (citations and internal quotation marks omitted). The Seventh Circuit has classified fact patterns that constitute materially adverse employment actions into three categories:

> (1) cases in which the employee's compensation, benefits or other financial terms of employment are diminished, including cases where employment is terminated; (2) cases in which a nominally lateral transfer without a change in financial terms significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced; and (3) [c]ases in which the employee is not moved to a different job or the skill requirements of his present job altered, but the conditions in which he works are changed in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment—an alteration that can fairly be characterized as objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet.

*Tart v. Ill. Power Co.*, 366 F.3d 461, 475 (7th Cir. 2004) (alteration in original) (internal quotation marks omitted).

*Moving Beard's Desk*. As noted above, Neumann's predecessor as general sales manager, Pisano, placed Beard's desk nearest to the dealership office's entrance because of Beard's difficulty walking. In 2008, Neumann and McCue had Beard's desk moved back from the dealership's entrance to 25 feet away, making it third or fourth from the door rather than closest to the door. Without more, the moving of Beard's desk was not a materially adverse employment action. Beard does not argue that it was a nominally neutral change that in fact diminished his chances for career advancement, or that it was "a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment—an alteration that can fairly be characterized as objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet." *Tart*, 366 F.3d at 475.

But if Beard's increased distance from the door in fact led to his receiving fewer commissions, then it may have been materially adverse. For then the move would have diminished the financial terms of his employment—it would in effect have cut the compensation he could expect, making it analogous to a decrease in salary for a salaried employee. Beard advances this argument in his brief, saying: "Because Don McCue Chevrolet has a 'first come, first serve policy,' the movement of Beard's desk by Neumann caused him difficulty in 'upping' customers. ... The moving of Beard's desk made it more difficult for Beard (who had difficulty getting out of his chair and walking) to sell cars to potential customers." Doc. 84 at 13. Yet Beard does not support this argument with a citation to his Local Rule 56.1(b)(3)(C) statement of additional undisputed material facts or to his Local Rule 56.1(b)(3)(B) response to Defendants' Local Rule 56.1(a)(3) statement. The only support his brief offers is a citation to the raw record, specifically to the transcript of his deposition, where in response to the question "Then in mid July of '08 were you able to up customers who would walk in the door?," he answered, "They moved my desk from the door so I was not able to get—because it was first come, first serve, I was not able to—there were two people in front of me, so I was not able to do that no longer." Doc. 86-2 at 12. This was not a mere technical error, the kind that occurs when a non-movant means to cite its Local Rule 56.1(b)(3) statement or response but instead mistakenly cites the record material upon which the Local Rule 56.1(b)(3) statement or response also relies. To the contrary, Beard's Local Rule 56.1(b)(3) statement and response do not address, let alone support, the above-quoted argument from his brief.

Beard's failure in this regard is fatal to his argument that the moving of his desk reduced his compensation. "Under settled law, facts asserted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion." *Perez v. Town of*

*Cicero*, 2011 WL 4626034, at *2 (N.D. Ill. Sept. 30, 2011); *see also Midwest Imps., Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (holding that the predecessor to Local Rule 56.1(b)(3) "provides the only acceptable means of … presenting additional facts to the district court"); *Garner v. Lakeside Cmty. Comm.*, 2011 WL 2415754, at *1 n.1 (N.D. Ill. June 13, 2011) ("the Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)[] statement of additional facts"); *Curtis v. Wilks*, 704 F. Supp. 2d 771, 789 (N.D. Ill. 2010) ("Any facts plaintiffs assert in their response brief that were not included in their LR 56.1 submissions will not be considered."); *Byrd-Tolson v. Supervalu, Inc.*, 500 F. Supp. 2d 962, 966 (N.D. Ill. 2007) ("facts are properly presented through the framework of the Rule 56.1 statements, and not through citation in the briefs to raw record material"). Accordingly, there is no properly presented evidence to support Beard's submission that moving his desk diminished his compensation and that Defendants had intended that result.[*] It follows that Beard has not

---

[*] Even if it were considered, the evidence cited in Beard's brief would not have created a genuine issue of material fact as to whether moving his desk diminished his compensation. The snippet of deposition testimony the brief cites says only that moving Beard's desk made it more difficult to greet customers first. The cited testimony does not say that this difficulty actually impacted his compensation. Moreover, testimony on the next page of the transcript shows that Beard often was unable to greet customers first even when his desk *was* closest to the door:

> Q:  In that circumstance [Beard's desk being closest to the door] you could have gotten every customer that walked through the door before anybody else would ever get to that customer; is that right?

> A:  No because there is salespeople that stand outside the door or salespeople that stand right in front of my desk. You can stand anywhere in the showroom. So there was always customers right by the door or in front of my desk or in front of the building so when they pull in they would intercept them before they came into the dealership.

Doc. 86-2 at 13. This testimony affirmatively undermines the notion—which, as noted, the testimony cited by Beard does not actually support—that moving Beard's desk had the effect of diminishing his compensation.

shown that a reasonable jury could conclude that moving his desk constitutes a materially adverse employment action for purposes of his race discrimination claims.

This outcome reflects an appropriate application of Local Rule 56.1. The rule provides the mechanism for determining whether the summary judgment record presents genuine factual disputes. *See Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). Whether seeking or opposing summary judgment, parties have a right to expect that Local Rule 56.1 will be enforced and that facts not properly presented under the rule will be disregarded. *See Renta v. Cnty. of Cook*, 2011 WL 249501, at *1-2 (N.D. Ill. Jan. 26, 2011). Given this, the court may and should enforce Local Rule 56.1, *see Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 360 (7th Cir. 2009) ("We have repeatedly held that the district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment motions."); *Raymond v. Ameritech Corp.*, 442 F.3d 600, 604 (7th Cir. 2006) ("district courts are entitled to expect strict compliance with Local Rule 56.1"), regardless of whether a party explicitly asks the court to do so, *see Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994) ("there is nothing improper in the court enforcing [a local summary judgment] rule strictly, even if the parties themselves have not raised the matter"); *Speed Boats of Tex., LP v. Bank of Am., N.A.*, 2011 WL 759955, at *1 n.1 (N.D. Ill. Feb. 25, 2011) ("a party's choice not to raise [an opposing party's Local Rule 56.1 violation] does not preclude a district court from holding a party to account for such violations *sua sponte*").

Nor is this outcome inconsistent with *Sojka v. Bovis Lend Lease, Inc.*, __ F.3d __, 2012 WL 2765031 (7th Cir. July 10, 2012). *Sojka* holds that where a non-movant properly includes facts sufficient to preclude summary judgment in a Local Rule 56.1(b)(3)(B) response or Local

Rule 56.1(b)(3)(C) statement, the district court must consider those facts and deny summary judgment even if the non-movant does not also recite or refer to those facts in his brief opposing summary judgment. *Id*. at *4–5. (*Sojka* recognizes that it is far better practice for the non-movant to reference those facts in his brief and to explain why they require denial of summary judgment, even if that step is not strictly required by Local Rule 56.1. *Id*. at *5.) Here, Beard's problem is that his Local Rule 56.1(b)(3) response and statement do not suggest, let alone show, that Defendants' decision to move his desk affected his compensation. As explained above, facts not presented through a Local Rule 56.1(b)(3) response or statement are disregarded on summary judgment. That rule is not abrogated by *Sojka*, and Beard's failure to comply with Local Rule 56.1(b) is fatal to this portion of his discrimination claim.

*Replacing Beard's Demo Car.* As noted above, after Neumann became general manager, Beard was required to exchange his new demo vehicle for a used one, and yet he was still required to pay the same demo charge. Defendants' replacement of Beard's demo car may have been an adverse employment action, but it was not a *materially* adverse action. Beard does not suggest that the used vehicle was substantially inferior to the new one in any particular way; nor does he explain why being forced to switch to a used vehicle rises to the level of a materially adverse employment action under the standard set forth in cases like *Nichols* and *Tart*. The switch was at most a mere inconvenience, falling safely within the rule that "not everything that makes an employee unhappy is an actionable adverse action." *Nichols*, 510 F.3d at 780.

*Failure to Promote Beard to Manager.* While alleging that Defendants failed to promote him to a management positions because of his race, Beard admits that he never sought promotion, with his explanation being that the custom at McCue Chevrolet is to promote successful salespersons without their having to apply. "In order to make a prima facie showing

-12-

of discrimination in a failure to promote case, the plaintiff must demonstrate that (1) he was a member of a protected group; (2) *he applied for* and was qualified for *the position sought*; (3) *he was rejected* for the position; and (4) those who were promoted had similar or lesser qualifications for the job." *Ghosh v. Ind. Dep't of Envtl. Mgmt.*, 192 F.3d 1087, 1090-91 (7th Cir. 1999) (emphasis added). Beard cannot show that he was rejected because he admits that he never sought a promotion in the first place. *See Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 436 (7th Cir. 2005) (the plaintiff "fails even to make it past the *prima facie* stage, for it is undisputed that he did not apply for those job openings (which were advertised) and therefore could not have been rejected for promotion to either opening").

Some employers select employees for promotion without a formal (or even an informal) application process; according to Beard, McCue Chevrolet is such an employer. Seventh Circuit precedent does not directly address whether the test set forth in *Ghosh* and *Cardoso* would accommodate this circumstance by allowing a failure to promote claim to proceed even where the employer does not entertain formal or informal applications for promotion. There is no need to speculate here on how the Seventh Circuit would resolve the issue, for Beard does not argue that the application-and-rejection requirement should not apply to him, and he does not point to case law from other circuits establishing an exception for employers whose promotion practice is similar to McCue Chevrolet's. Indeed, Beard does not cite or discuss any failure-to-promote cases whatsoever in the section of his brief devoted to his failure-to-promote discrimination claim. Doc. 84 at 14; *see* Doc. 79 at 11-12 (where Defendants' initial brief cites authority for the proposition that there can be no failure-to-promote claim unless the plaintiff applies for a promotion). This forfeits the point. *See Witte v. Wis. Dep't of Corr.*, 434 F.3d 1031, 1038 (7th

Cir. 2006) (the non-movant forfeits arguments not raised in its brief opposing summary judgment).

*Termination*. "Termination is unquestionably a materially adverse action." *Pantoja v. Am. NTN Bearing Mfg. Co.*, 495 F.3d 840, 849 (7th Cir. 2007) (internal quotation marks omitted). Yet Beard's own evidence indisputably shows that he was not terminated, but rather that he quit. True, shortly after Beard left work early on July 15, Neumann told him he was fired for leaving early. But the next day, when Beard arrived to clean out his desk, Neumann told Beard to think hard about whether he wanted to keep working for McCue Chevrolet, and that if he did want to keep working he should be back on Monday, the next day he was scheduled to work. Doc. 86 at ¶ 64. Beard admits that Neumann told him this. *Ibid*. Moreover, Beard testified that Neumann told him that he "was not being terminated." Doc. 86-8 at 10. And in response to Defendants' assertion in their Local Rule 56.1(a)(3) statement that "[a]t no time on July 16, 2008, did Neumann or McCue tell Beard that his employment … had been terminated, and Plaintiff admits that he was specifically told he was not terminated on *July 16, 2008*," Beard responds only that Neumann had told Beard that he was fired *on* "*July 15, 2008*." Doc. 86 at ¶ 65 (emphasis added). Because Beard's response is not responsive to Defendants' assertion about July 16 and certainly does not controvert it, Beard is deemed to have admitted the assertion. *See* Local Rule 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Cracco*, 559 F.3d at 632; *Bay Area Bus. Council*, 423 F.3d at 634; *Smith v. Lamz*, 321 F.3d 680, 682-83 (7th Cir. 2003); *Waldridge*, 24 F.3d at 922 (collecting cases). That Beard admits he was given the choice on July 16 whether or not to keep working at McCue Chevrolet is enough to establish that Beard had not been fired and that he subjectively understood that he had not been fired. No reasonable jury could find otherwise on this record.

Beard contends that this does not add up, arguing: "Beard was a top salesperson at Don McCue Chevrolet, and in 2007, earned over $100,000.00. It does not make sense that Beard, an eighteen year employee who was making over $100,000.00, would quit his job in a struggling economy." Doc. 84 at 10. Beard's decision not to return to work after his July 16 discussion with Neumann may have been rash or inexplicable, but it cannot raise a genuine issue of material fact as to whether he in fact was terminated, given his own admission that Neumann told him that he was not terminated and gave him the option of keeping his job. *See Sander v. Gray Television Group, Inc.*, 2012 WL 1323705, at *5-7 (6th Cir. Apr. 18, 2012) (affirming the district court's grant of summary judgment to the defendant where the employment discrimination plaintiff had voluntarily resigned); *Evans v. Davie Truckers, Inc.*, 769 F.3d 1012, 1014 (4th Cir. 1985) (affirming the district court's holding that the plaintiff failed to make a prima facie case of discriminatory discharge where he had not been terminated but instead had voluntarily quit).

*Other Employment Actions.* Beard's brief refers to several other alleged adverse employment actions: Neumann's berating of him in front of customers; Defendants' failure to provide him with the password to the GM build website; their denial to him of time off to attend funerals; their requirement that he pay for his own postage for customer mailings; their placing of his customers in the back of the finance queue; and their referring his customers to other salespersons in contravention of the dealership's customer protection policy. Doc. 84 at 14. Beard's brief continues, "Although maybe not rising to the level of adverse job actions, these incidents show that Beard was being treated differently than the other employees, and provide[] evidence that any reason for his termination was pretextual." *Ibid.* Beard is right not to argue that any of these qualifies as materially adverse, for they do not. And because Beard has failed

to adduce evidence that could establish that he suffered any materially adverse employment action, his race discrimination claims under Title VII and § 1981 fail as a matter of law.

## B.    ADA

Like Title VII and § 1981, the ADA requires a plaintiff alleging disability discrimination to show that he suffered a materially adverse employment action. *See Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115-16 (7th Cir. 2001). Adverse actions enumerated in the ADA automatically qualify as material—discrimination in "job application procedures, the hiring, advancement, or discharge or employees, employee compensation, [and] job training," 42 U.S.C. § 12112(a)—while non-enumerated adverse actions must independently satisfy the generally applicable materiality standard discussed above. *See Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 574-76 (7th Cir. 2001).

Beard urges the same four adverse employment actions to support his ADA claim as he does to support his race discrimination claims. The first two actions (moving his desk and giving him an inferior demo car) cannot ground Beard's ADA discrimination claim because they are not enumerated in the ADA and do not satisfy the materiality standard. The third and fourth actions (failure to promote and termination) are enumerated in the ADA but, as shown above, Beard did not apply for a promotion only to be rejected and was not terminated. Accordingly, Beard's ADA discrimination claim fails for the same reasons as his Title VII and § 1981 discrimination claims.

## III.    Title VII and § 1981 Hostile Work Environment Claims

Beard alleges that he suffered harassment on the basis of race that created a hostile work environment in violation of Title VII and § 1981. Again, the two statutes call for the same analysis. *See Ellis v. CCA of Tenn., LLC*, 650 F.3d 640, 647 (7th Cir. 2011). To survive

summary judgment, Beard must provide enough evidence for a reasonable jury to conclude that: (1) his work environment was both subjectively and objectively offensive; (2) his race was the cause of the harassment; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *See Montgomery v. Am. Airlines, Inc*., 626 F.3d 382, 390 (7th Cir. 2010); *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). Beard's claim founders on the third element, as no reasonable jury could find that the harassing conduct alleged by Beard was severe or pervasive.

Title VII and § 1981 do not impose a "general civility code," and "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted). Relevant considerations include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Applying this standard, the Seventh Circuit affirmed a grant of summary judgment for the defendant on a sex-based hostile work environment claim where the plaintiff's male coworker introduced her to other employees as the person in charge of "cookies with sprinkles"; said that he hated "pushy, aggressive women" and that the plaintiff was such a woman; said that she was "made for the back seat of a car" and looked like a "dyke"; and subjected her to mistreatment that was not explicitly sex-based, including allegedly hitting her with a clipboard. *Scruggs*, 587 F.3d at 836, 841. The Seventh Circuit held that this conduct was not enough for the plaintiff to show that the harassment was "objectively severe or pervasive." *Id*. at 841.

The actions alleged by Beard is less severe and pervasive than the conduct in *Scruggs*, which means that his hostile work environment claim must fail. He has produced evidence of just two explicitly racial incidents: the statement about ordering "watermelons and bananas," and the replacement of the photograph of his son. Even when these incidents are considered in conjunction with the incidents that are not explicitly racial—the replacement of Beard's demo car, Neumann's harsh words to Beard in front of customers, the moving of his desk, and Neumann's hip check—the picture Beard paints is not one of severe or pervasive hostility. Beard does not argue that this mistreatment detracted from his work performance; to the contrary, he strenuously argues that his performance was excellent throughout his employment. Taken all together, Beard's alleged mistreatment cannot be said to have been "sufficiently severe or pervasive to alter the conditions of [Beard's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotation mark omitted).

**IV.     ADA Failure to Accommodate Claim**

Defendants contend that Beard failed to exhaust his administrative remedies as to his ADA failure to accommodate claim. "In Illinois, an employee may sue under the … ADA only if he files a charge of discrimination with the EEOC within 300 days of the alleged 'unlawful employment practice.'" *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004). In *McKenzie v. Illinois Dep't of Transportation*, 92 F.3d 473 (7th Cir. 1996), the Seventh Circuit held that "[g]enerally, a Title VII plaintiff may bring only those claims that were included in her EEOC charge, or that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Id.* at 481 (citation omitted) (quoting *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir. 1976) (en banc)); *see also Cheek v.*

*W. & S. Life Ins. Co.*, 31 F.3d 497, 500-01 (7th Cir. 1994). *McKenzie* refers to "a Title VII

plaintiff," but "because the ADA's enforcement provision expressly incorporates the

enforcement provisions of Title VII, the analysis of the statutory requirements for filing a claim

under each will be the same." *Easton v. Coll. of Lake Cnty.*, 584 F. Supp. 2d 1069, 1075 (N.D.

Ill. 2008); *see also* 42 U.S.C. § 12117(a) (incorporating Title VII's exhaustion requirement, 42

U.S.C. § 2000e-5, into the ADA).

Beard's EEOC charge alleges discrimination and harassment on the basis of race and

disability, but does not so much as hint at a failure to accommodate his disability.  The charge's

account of the particulars of Beard's grievances reads in full:

> I began my employment with Respondent in 1990.  My most recent position
> was Sales Person.  During my employment I was subjected to harassment
> and different terms and conditions.  I complained about racial harassment.
> On July 16, 2008, I was discharged.
>
> I believe I was discriminated against because of my race, Black, and
> because of engaging in protected activity in violation of Title VII of the
> Civil Rights Act of 1964, as amended.  I also believe I was discriminated
> against because of my disability in violation of Title I of the American[s]
> With Disabilities Act of 1990.

Doc. 1 at 13.  Only the final sentence relates to the ADA or Beard's disability.  It refers to

*discrimination* on the basis of disability, but says nothing about any potential *accommodation* of

that disability or of Defendants' rejection of such an accommodation.

The EEOC charge's lack of an explicit allegation of failure to accommodate is not

necessarily fatal.  As the Seventh Circuit explained in *Cheek*:

> [B]ecause most EEOC charges are completed by laypersons rather than by
> lawyers, a Title VII plaintiff need not allege in an EEOC charge each and
> every fact that combines to form the basis of each claim in her complaint.
> The test for determining whether an EEOC charge encompasses the claims
> in a complaint therefore grants the Title VII plaintiff significant leeway: all
> Title VII claims set forth in a complaint are cognizable that are "like or

reasonably related to the allegations of the charge and growing out of such allegations." Thus the test ... is satisfied if there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge.

31 F.3d at 500 (citation omitted) (quoting *Jenkins*, 538 F.2d at 167); *see also Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 898 (7th Cir. 1999) (applying *Cheek*'s exhaustion requirement to an ADA failure to accommodate claim). But Beard's charge does not satisfy even *Cheek*'s flexible standard. It refers only to disability-based discrimination, and the Seventh Circuit made clear in *Green* that

a failure to accommodate claim is separate and distinct from a claim of discriminatory treatment under the ADA. In fact, the two types of claims are analyzed differently under the law. Therefore, they are not like or reasonably related to one another, and one cannot expect a failure to accommodate claim to develop from an investigation into a claim that an employee was terminated because of a disability.

197 F.3d at 898 (citations omitted); *see also Williams v. City of Chicago*, 2012 WL 205908, at *1-3 (N.D. Ill. Jan. 24, 2012) (dismissing an ADA accommodation claim for failure to exhaust administrative remedies); *Kaplan v. New Trier High Sch.*, 2011 WL 2148936, at *3 (N.D. Ill. May 31, 2011) (holding that a failure to accommodate claim exceeded the scope of an EEOC charge that alleged only disability discrimination); *Baker v. Potter*, 2005 WL 843169, at *10 (N.D. Ill. Jan. 20, 2005) ("A complaint of disparate treatment and retaliation would not naturally lead into an investigation of a failure to accommodate.").

Beard responds that *Green* does not control this case because his "termination and failure to accommodate claims arose out of the same operative facts and these facts are intertwined." Doc. 84 at 3. To support this argument, Beard cites only *Davis v. American Drug Stores, Inc.*,

2003 WL 21149063, at * 3 (N.D. Ill. May 19, 2003). This case is much closer to *Green* than to

*Davis*. *Davis* distinguished *Green* as follows:

> Green's accommodation claim was premised on her former employer's
> failure to make modifications to her work environment, a claim that was not
> likely to 'develop from the investigation of the reasons for her discharge.'
> In this case, however, the accommodation and discharge claims are
> inextricably intertwined. Defendant says that it discharged plaintiff because
> she did not return to work after her asthma attack. Yet, time off to
> recuperate is precisely the accommodation that plaintiff sought. Thus, the
> decision to discharge plaintiff was, in effect, a refusal to provide her the
> accommodation of further time off.

*Davis*, 2003 WL 21149063, at *3 (quoting *Green*, 197 F.3d at 897). As in *Green*, and unlike

*Davis*, Beard's accommodation claim is based on Defendants' refusal to allow him to use a golf

cart to get around the lot, to pay the dealership's porters to pull up cars for test drives, to park in

customer parking, or to have a desk nearest to the door. Those failures to accommodate have

nothing to do with Beard's alleged termination. Beard does not argue that he was fired because

his disability, coupled with Defendants' failure to accommodate it, prevented him from

performing his job adequately—he does not argue, for example, that Defendants made it hard for

him to make sales by moving his desk away from the door and then fired him for not meeting his

sales quota. *Davis* therefore does Beard no good.

Because Beard did not exhaust his failure to accommodate claim, Defendants are entitled

to judgment on that claim. The judgment, however, is without prejudice. The Seventh Circuit

has explained that "the proper remedy for a failure to exhaust administrative remedies is to

dismiss the suit without prejudice, thereby leaving the plaintiff free to refile his suit when and if

he exhausts all of his administrative remedies or drops the unexhausted claims." *Greene v.

Meese*, 875 F.2d 639, 643 (7th Cir. 1989); *see also Ford v. Johnson*, 362 F.3d 395, 401 (7th Cir.

2004); *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002); *Donnelly v. Yellow Freight*

*Sys., Inc.*, 874 F.2d 402, 410 n.11 (7th Cir. 1989).  This principle applies to dismissals for failure to exhaust employment claims before the EEOC; such dismissals are without prejudice to the plaintiff bringing her claim to federal court upon exhausting the unexhausted claims.  *See Teal v. Potter*, 559 F.3d 687, 693 (7th Cir. 2009); *Hill v. Potter*, 352 F.3d 1142, 1145-46 (7th Cir. 2003).

That said, there may be no practical distinction between a dismissal with prejudice and a dismissal without prejudice of Beard's unexhausted ADA failure to accommodate claim.  The reason is that the 300-day window for Beard to file an administrative charge regarding that claim likely has expired.  *See Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 681 n.5 (7th Cir. 2007) (a claimant must "fil[e] a charge with the Equal Employment Opportunity Commission within … 300 days in states like Illinois that do [have an equal employment opportunity agency]").  So if Beard files a fresh administrative charge encompassing the ADA failure to accommodate claim, and then attempts to pursue that claim in federal court, the claim likely will be dismissed with prejudice on limitation grounds, unless some basis for extending or tolling the limitations period applies.  *See Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1121 n.4 (7th Cir. 2009); *Stepney*, 392 F.3d at 241 ("Stepney's EEOC charge, filed more than 600 days after the accrual of his claims, was untimely and that untimeliness bars the present action."); *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 892-93 (7th Cir. 2001) ("[t]he district court correctly found that these claims were barred by the Title VII statute of limitations" where the EEOC charge "was filed more than 300 days" after the plaintiff should have known of alleged discrimination).  The discussion is hypothetical at this point, as Beard has not attempted to exhaust the failure to accommodate claim.

## Conclusion

For the foregoing reasons, summary judgment is granted in favor of Defendants on all counts, without prejudice as to Beard's ADA failure to accommodate and with prejudice as to all other claims.

July 18, 2012

_____
United States District Judge